# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TOWN OF DUTCH JOHN,<br><br>Plaintiff,<br>v.<br><br>DAGGETT COUNTY, a political subdivision; RANDY ASAY, JACK LYTLE, and CLYDE SLAUGH, in their official capacities as members of the DAGGETT COUNTY BOARD OF COMMISSIONERS; and DAGGETT COUNTY REDEVELOPMENT AGENCY,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br><br>Case No. 2:18-cv-00444-DB<br><br>District Judge Dee Benson |

Before the court is a motion for partial judgment on the pleadings filed on August 13, 2018 by Defendants Daggett County, Randy Asay, Jack Lytle, and Clyde Slaugh (collectively "County Defendants") under Federal Rule of Civil Procedure 12(c). (Dkt. No. 29.) Plaintiff, the Town of Dutch John, filed its memorandum in opposition to County Defendants' motion on September 10, 2018. (Dkt. No. 32.) County Defendants filed a reply in response to Plaintiff's opposition on September 24, 2018. (Dkt. No. 35.) On January 10, 2019, the court heard oral argument on County Defendants' motion for partial judgment on the pleadings, as well as Defendant Daggett County Redevelopment Agency's motion to dismiss for failure to state a claim. (Dkt. Nos. 25, 29, and 42.) At the conclusion of the hearing, the court opted to take the matter under advisement with a written order to follow.

The court now enters the following order granting Defendants' motion for judgment on the pleadings.

## BACKGROUND

Plaintiff, the Town of Dutch John (the "Town"), is located in Daggett County, Utah near Flaming Gorge Reservoir, and was incorporated as a town in 2015. (Dkt. No. 2 at 2.) Prior to its incorporation, it was referred to as the "Dutch John community," and was founded by the Secretary of the Interior in 1958 on Bureau of Reclamation land as authorized by the April 11, 1956 Colorado River Storage Project Act. (*Id.* at 4.) Dutch John's central statutory purpose was to "house personnel, administrative offices, and equipment for project construction and operation of the Flaming Gorge Dam and Reservoir." (Dkt. No. 34-1 at 3.) Permanent structures like houses, administrative offices, equipment storage and maintenance buildings, and other public facilities were constructed, owned, and maintained by the Secretary of the Interior. (*Id.*)

In 1968, Public Law 90-540 then "assigned responsibility for administration, protection, and development of the Flaming Gorge National Recreation Area to the Secretary of Agriculture" while providing that Colorado River Storage Project lands and waters "would continue to be administered by the Secretary of Interior." (*Id.*) The statute included Bureau of Reclamation land surrounding the Flaming Gorge Reservoir (including the Dutch John community) within its description of the Flaming Gorge National Recreation Area boundaries. (*Id.*) Prior to 1998, most structures within the Dutch John community were administered by the Secretary of Agriculture, including the community's schools and public buildings. (*Id.*)

The federal government thus owned and operated a large portion of Dutch John community lands until 1998, when Congress passed the Dutch John Federal Property Disposition and Assistance Act ("the Privatization Act"). (Dkt. No. 2 at 4.) This act privatized many of the community's lands, and was passed "[t]o dispose of certain Federal properties located in Dutch John, Utah, to assist the local government in the interim delivery of basic services to the Dutch

John community, and for other purposes." (Dkt. No. 34-1 at 3.) After the Act was enacted into law, the federal government began disposing of the property as the Act directed, including transferring certain properties to Daggett County (the "County") without consideration and offering other properties for sale as designated by the Act. (Dkt. No. 24 at 13.)

In enacting the Privatization Act, Congress found, inter alia, that:

- The Federal Government was unnecessarily burdened with the cost of operating the Dutch John community, including providing basic services and maintaining facilities;
- Daggett County was also "interested in reducing the financial burden the County experience[d] in providing local government support services to [the Dutch John] community that produce[d] little direct tax revenue because of Federal ownership";
- Withdrawing the Federal Government's role in providing basic direct community services to Dutch John would require local government to provide the services at a substantial cost;
- Dutch John residents were interested in purchasing the homes they were renting from the Secretary of the Interior;
- Dutch John residents were interested in self-government;
- Available private lands were insufficient to meet Flaming Gorge area visitors' growing demands for commercial recreational services and private development; and
- Privatization and disposal of certain lands in Dutch John would be in the public interest.

*See* Pub. L. No. 105-326, §2(a), 112 Stat. 3040 (1998).

The Privatization Act then lists its eight statutory purposes as follows:

    (1) to privatize certain lands in and surrounding Dutch John Utah;
    (2) transfer jurisdiction of certain Federal property between the Secretary of Agriculture and the Secretary of the Interior;
    (3) to improve the Flaming Gorge National Recreational Area;
    (4) to dispose of certain residential units, public buildings, and facilities;
    (5) to provide interim financial assistance to local government to defray the cost of providing basic governmental services;
    (6) to achieve efficiencies in operation of the Flaming Gorge Dam and Reservoir and the Flaming Gorge National Recreation Area;
    (7) to reduce long-term Federal outlays; and
    (8) to serve the interests of the residents of Dutch John and Daggett County, Utah, and the general public.

*Id.* §2(b), 112 Stat. 3041.

To implement these purposes, Section 4 of the Act identifies categories of Dutch John properties (approximately 2,450 acres) that "the Secretary of Agriculture and the Secretary of the Interior" are to dispose of in accordance with the Act. Specifically, it states that "[l]ands, structures, and community infrastructure facilities within or associated with Dutch John . . . that have been identified by the Secretary of Agriculture or the Secretary of the Interior as unnecessary for support of the agency of the respective Secretary shall be transferred or disposed of in accordance with this Act." *Id.* §4(a), 112 Stat. 3041-42. It then provides instructions on how the "Secretary of Agriculture" or the "Secretary of the Interior" "shall dispose of" each of the various properties listed, except for certain "retained properties" listed under Section 4(e) which the Secretary of Agriculture and the Secretary of the Interior are instructed to retain for their respective use.[1] *Id.* §4, 112 Stat. 3041-43. Section 6 in relevant part provides that all lands designated under Section 4 for disposal (except for the retained properties under Section 4(e)) "shall be transferred from the jurisdiction of the Secretary of Agriculture to the Secretary of the Interior . . . ." *See id.* §6(a)(1), 112 Stat. 3044.

Section 9 then directs the Secretary of the Interior to "conduct appraisals to determine the fair market value of properties designated for disposal" under Section 4 of the Act. *Id.* § 9(a)(1), 112 Stat. 3045-46. For some of these properties, the Secretary is instructed to conduct appraisals within 180 days after enactment of the Act, *e.g.*, § 9(a)(1) (including occupied and unoccupied residential units, occupied lots, and church land); for others, the Secretary must wait until receiving a notice of intent to purchase to do appraisals, *e.g.*, §§ 9(a)(2) & (3) (including unoccupied platted lots and special use permits land). Section 9 also provides, inter alia, that

---

[1] The Act provides, however, that these properties need not be retained to the extent they "are determined by the Secretary of Agriculture or the Secretary of the Interior to be available for disposal."

funding for these appraisals "shall be derived from the Upper Colorado River Basin Fund authorized by . . . the Act of April 11, 1956," that the Secretary of the Interior must make these appraisals "available for review by a current occupant or lessee," and that the "Secretary of the Interior shall provide opportunities for other . . . purchasers to inspect completed appraisals under this section." *Id.* §§ 9(a)(6), 9(d)(1), and 9(e), 112 Stat. 3046-47.

Section 10 then provides instructions on disposal of the properties previously identified under Section 4 of the Act.[2] Section 10(a), titled "Conveyances," specifically provides that "[t]he Secretary of the Interior shall dispose of properties identified for disposal under section 4." *Id.* § 10(a)(1), 112 Stat. 3047. For those identified properties to be sold,[3] the Secretary of the Interior must provide "local general public notice, and written notice to lessees and to current occupants of residences and of occupied residential lots for disposal, of the intent to sell properties under this Act." *Id.* § 10(e)(1)(B), 112 Stat. 3047. For most categories of property, the Act requires that the property be first offered for sale to current lessees or permit holders,[4] and then be made available for purchase to other identified persons (such as current occupants of residences, reclamation lease holders, and certain Dutch John residents) if the Secretary does not

---

[2] These do not include the "retained properties" identified under Section 4(e).

[3] The Act provides that certain "infrastructure facilities and land" and uncategorized residual properties "shall be conveyed, without consideration, to Daggett County" without first offering those properties for sale to lessees or other occupants. *Id.* §§ 10(b), 10(j), 112 Stat. 3047, 3051. For the uncategorized residual properties, the statute again clarifies that the "Secretary of the Interior" is the party conveying those properties to Daggett County. *Id.*

[4] *E.g.*, Act § 10(e)(2)(A), 112 Stat. 3048 ("[T]he Secretary of the Interior shall provide a holder of a current lease . . . a period of 180 days beginning on the date of the written notice of the Secretary of intent of the Secretary to sell the residence or lot, to execute a contract with the Secretary of the Interior to purchase the residence or lot for the appraised fair market value."); *see also* § 10(e)(2)(B), 112 Stat. 3048 (noting that current lessees "during the 30-day period beginning on the date of receipt of the notice [from the Secretary must] notify the Secretary in writing of the intent of the lessee to purchase the residence or lot.").

5

receive written notification from the current lessee of intent to purchase the property.[5] *Id.* §§ 10(e)(2), 10(e)(3), 112 Stat. 3047-48.

For the contested properties in this case, namely 1) residences and occupied residential lots, 2) unoccupied platted lots, 3) certain Forest Service special use permit lands, and 4) church lands (what the court will refer to collectively as "FMV Property"), Section 10 provides a condition that such properties must all be sold by the Secretary of the Interior for their "appraised fair market value." *See id.* §§ 10(e)(1), (f)(1), (g), (i)(1), 112 Stat. 3047-51. For instance, the Act states that "residence[s] and occupied residential lot[s] to be disposed of under this Act shall be sold for the appraised fair market value." *Id.* § 10(e)(1)(A), 112 Stat. 3047. The provision immediately following § 10(e)(1)(A) then clarifies that it is "[t]he Secretary of the Interior" who is responsible for providing "local general public notice, and written notice to lessees and to current occupants of residences and of occupied residential lots for disposal, of the intent to sell properties under this Act." *Id.* § 10(e)(1)(B), 112 Stat. 3047. Unoccupied platted lots, special use permit lands, and church lands must likewise be made available for sale to eligible purchasers by the Secretary of the Interior for fair market value, subject to certain specific conditions. *Id.* §§ 10(f)(1), (g), (i)(1), 112 Stat. 3049-51.

Each of these FMV Property subsections under Section 10 also includes a provision disposing of "residual property," meaning the residences or lots that remain unpurchased after the Secretary of the Interior offers them for sale.[6] Specifically, the Act instructs that any residual property that is not purchased within two years after the Secretary of the Interior provides the

---

[5] "The Secretary of the Interior shall compile a priority list of eligible potential purchasers that is based on the length of continuous residency in Dutch John or the length of a continuous residency lease . . . with the highest priority provided for purchasers with the longest continuous residency or lease." *Id.* § 10(e)(3)(B)(ii), 112 Stat. 3048.

[6] *E.g.*, Section 10(e)(4) of the Act is accordingly titled "Residual Property to County"; Section 10(f)(7) is titled "Residual Lots to County"; and Sections 10(g)(6) and Section 10(i)(3) are titled "Residual Land to County."

first notice of intent to sell must be conveyed by the Secretary of the Interior to Daggett County "without consideration." *Id.* §§ 10(e)(4), 10(f)(1) & (7), 10(g)(1) & (6), 10(i)(1) & (3), 112 Stat. 3049-51.

Section 10(m), titled "Revenues," is the chief provision at issue in this case. It requires that "all revenues derived from the sale of properties as authorized by this Act shall temporarily be deposited in a segregated interest-bearing trust account in the Treasury with the moneys on hand in the account paid to Daggett County semiannually to be used by the County for purposes associated with the provision of governmental and community services to the Dutch John community." *Id.* § 10(m)(1), 112 Stat. 3052. Of these revenues, "15.1 percent shall be deposited in the general fund of the Treasury," with the 84.9 percent remainder paid semiannually to Daggett County as described above. *Id.* § 10(m)(2), 112 Stat. 3052.

To assist with the transition of services to local government control, the Act requires the federal government to begin paying Daggett County $300,000 per year (for a period of up to 15 years commencing in 1998) to "defray[] costs of transition in administration and provision of basic community services" to the Dutch John community. *Id.* § 13(b), 112 Stat. 3053. If Dutch John becomes an incorporated town, the Act provides that the $300,000 payment must be proportionately divided between Daggett County and Dutch John based on the respective costs paid by each government the previous year to operate certain infrastructure facilities and provide basic community services. *Id.* § 13(c), 112 Stat. 3053.

Plaintiff alleges (upon information and belief) that Daggett County has sold approximately $4 million dollars of residual property that the Secretary of the Interior conveyed to the County in accordance with the Act, but that the County has improperly retained for itself over $600,000 of revenues due to the U.S. Treasury and has not used the remaining proceeds for

7

purposes of providing community services to the Town, as allegedly required under Section 10(m).  (Dkt. No. 2 at 7; Dkt. No. 32 at 4.)  Plaintiff argues that Section 10(m)'s requirement to sell the property for fair market value and deposit all revenues in the general fund of the Treasury applies to Daggett County's subsequent sales of residual property conveyed to it under the Act.  Plaintiff defends this position by asserting that the language of Section 10(m) does not actually confine "revenues derived from the sale of properties" to only revenues from those properties initially sold by the Secretary of the Interior.  (Dkt. No. 32 at 8.)  Plaintiff also maintains that at this stage of the litigation, "the parties should be entitled to analyze extrinsic evidence regarding the disputed language and engage in discovery to further prove the legislative intent to aid the Court in resolving this dispute."  (*Id.* at 6.)

County Defendants argue that the Act's plain language does not support Plaintiff's allegations that 1) the County may only sell the residual property conveyed to it for fair market value or 2) that such sales must be paid to the Treasury to be split between the federal government and Dutch John community services.  (Dkt. No. 29 at 4.)  Instead, County Defendants contend that the Act's language, specific context, and broader context of the Act as a whole all "unambiguously appl[y] those requirements only to the Secretary of the Interior, not the county." (*Id.*)  County Defendants accordingly seek a declaration from the court that the property conveyed by the federal government to Daggett County under the Act gives the County "sole ownership in fee, and releases the property from the Act's control, including any requirements or restrictions regarding its management or disposition, or concerning the proceeds from sales thereof." (*Id.* at 3.)

On June 5, 2018, Plaintiff filed this action regarding the parties' conflicting interpretations of the Privatization Act seeking declaratory judgment, injunctive relief, and an

8

accounting against County Defendants. County Defendants filed their answer and counterclaim for an injunction and declaratory judgment against Plaintiff on July 16, 2018. (Dkt. No. 24.) County Defendants have limited this motion for partial judgment on the pleadings to Plaintiff's causes of action and County Defendants' declaratory judgment counterclaim. (Dkt. No. 28 at 3.)

## DISCUSSION

As with Rule 12(b)(6), a Rule 12(c) motion for judgment on the pleadings requires the court to "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in that party's favor." *Martin Marietta Materials, Inc. v. Kansas Dep't of Transp.*, 810 F.3d 1161, 1171 (10th Cir. 2016). Thus as with a motion to dismiss, the court looks to the specific allegations in the complaint to determine whether they plausibly support a claim for relief. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

Issues of statutory interpretation are questions of law. *United States v. Almaraz*, 306 F.3d 1031, 1035 (10th Cir. 2002). As with any statutory interpretation question, "we begin with the text" by examining the "plain language of the statute." *United States v. Gonzales*, 456 F.3d 1178, 1181 (10th Cir. 2006); *United States v. Ortiz,* 427 F.3d 1278, 1282 (10th Cir. 2005). The Supreme Court has instructed that while canons of construction are useful tools to assist courts with interpreting statutory meaning, "a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Accordingly, "when the statute's language is plain, the sole function of courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms" as Congress drafted it. *Hartford Underwriters Ins. Co. v.*

*Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S. Ct. 1942, 1947, 147 L. Ed. 2d 1 (2000). "[I]f the statutory language is unambiguous and the statutory scheme is coherent and consistent," the court's inquiry ends there. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).

"A statute is ambiguous if it is reasonably susceptible to more than one interpretation or capable of being understood in two or more possible senses or ways." *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1226 (10th Cir. 2014) (citation omitted). In determining whether statutory language is plain or ambiguous, courts examine "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). While making this determination, courts must also bear in mind the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (U.S. 2000). "A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569 (1995).

Employing these foundational canons of construction, the court finds that the plain and unambiguous meaning of the Privatization Act clearly favors County Defendants' interpretation of Section 10(m), especially when that section's language is construed in context of the statute as a whole. Specifically, Plaintiff's interpretation is untenable because 1) the Act only "authorizes" the federal government to sell its properties (identified in Section 4) according to Section 10's instructions for disposing of those properties, and never mentions the County's subsequent sales of its conveyed residual property; 2) the Act only imposes its "fair market value" requirements (e.g., appraisal and selling) on the federal government; and 3) Plaintiff's interpretation

contradicts the Act's plain requirement that residual properties must be conveyed to the County "without consideration."

### I. "The Sale of Properties as Authorized by this Act"

Because Section 10(m) of the Act is the central provision at issue in this case, the court begins with the text of that provision. Section 10(m) provides:

> [A]ll revenues derived from the sale of properties as authorized by this Act shall temporarily be deposited in a segregated interest-bearing trust account in the Treasury with the moneys on hand in the account paid to Daggett County semiannually to be used by the County for purposes associated with the provision of governmental and community services to the Dutch John Community.

The meaning of the language of Section 10(m) is plain on its face: if the sale of any property is authorized by this Act, revenues from that sale must be deposited in a designated U.S. Treasury account. Yet the text itself signals that the court must look beyond that isolated provision to the context of the statute as a whole to determine which "sale[s] of properties" the Act authorizes. Such an examination of Section 10(m)'s place within the context of the entire statutory scheme enables the court to decide whether or not the County's revenues from residual property sales must also be deposited with the Treasury.

Throughout the entirety of the Act, the federal government is explicitly identified as the principal actor carrying out its essential requirements. For example:

- Section 4 of the Act instructs the federal government to identify lands unnecessary for support of the respective agencies and to dispose of those lands;
- Section 6 requires the Secretary of Agriculture to transfer jurisdiction over those identified lands to the Secretary of the Interior;
- Section 8 requires the federal government to develop a land use plan and ensure that disposal processes are consistent with said plan;
- Section 9 requires the Secretary of the Interior to conduct appraisals to determine the fair market value of properties designated for disposal under Section 4; and
- Section 10 instructs the Secretary of the Interior to dispose of properties identified for disposal under Section 4, and to convey any residual properties to Daggett County without consideration.

By contrast, Plaintiff has failed to identify a single provision that even addresses the County's disposal of residual properties conveyed to it under the Act.

Furthermore, upon examining the Act in its entirety, the court finds that Section 10 authorizes disposition of those properties "identified for disposal under section 4," and Section 10 only authorizes the federal government (both explicitly and implicitly) to sell certain properties identified under Section 4 for disposal. Simply put, no other provision in the Act authorizes the sale of properties, and Section 10 only authorizes the federal government to conduct such sales. The court thus finds it apparent from both the specific context of Section 10 and the broader context of the statute as a whole that the Act's drafters never intended that the County's subsequent sales of residual property would be subject to Section 10(m)'s requirements.

Nor does the County need the Act's "authorization" to sell its properties conveyed to it by the Secretary of the Interior. Under Utah law, "[a] fee simple title is presumed to be intended to pass by a conveyance of real estate, unless it appears from the conveyance that a lesser estate was intended." Utah Code § 57-1-3. Plaintiff has shown no evidence that the Act intended for residual property conveyed by the Secretary of the Interior to the County to be a lesser estate than fee simple. The Act does not reserve continuing control over the residual properties or provide that any post-conveyance obligations bind their future disposition. As County Defendants persuasively observe, "[n]othing [in the Act] indicates that the obligations binding the Secretary of the Interior somehow run with the land or otherwise continue through subsequent conveyances." (Dkt. No. 29 at 11.) Absent clear language to the contrary, the presumption in favor of fee simple title conveyance strongly favors County Defendants' interpretation of Section 10(m). Accordingly, because the County does not require authorization

to sell its fee simple properties after conveyance, it cannot be said that such residual property sales are "authorized by this Act."

Plaintiff argues that because the language of 10(m) is silent regarding who the specific seller is, the best interpretation of "revenues derived from the sale of properties" includes revenues from "the sale of properties not retained by the federal government and authorized to be sold by the Act by either the Secretary of the Interior *or the County* . . . ." (Dkt. No. 32 at 8) (emphasis added.) The problem with this interpretation is that the Act never refers to, much less "authorizes," such subsequent residual property sales by the County. The Act only requires the Secretary of the Interior to convey residual properties to the County without consideration, and never once mentions any future requirements for the County with respect to disposition of those properties. The court declines to "read into the statute a mandatory provision that Congress declined to supply." *Illinois Public Telecommunications Ass'n v. FCC*, 752 F.3d 1018, 1023 (D.C. Cir. 2014).

Plaintiff also argues that even if the County's interpretation of Section 10(m) is reasonable, the legislative intent and history demonstrate that Plaintiff's interpretation should control. (See Dkt. No. 32 at 13.) Plaintiff asserts that the Act's purposes listed in Section 2(b) are predominantly to provide services to the Town, serve the interests of the residents of Dutch John, and help reduce the cost of such services, and that accordingly the "Town's interpretation [of Section 10(m)] coalesces with the Act's stated purposes." (*Id.* at 14.) It also asserts that a U.S. Senate floor speech from the original bill's author, Senator Orrin Hatch, confirms that the Town's interpretation is most consistent with the Act's legislative intent.[7] While true that courts

---

[7] When introducing the bill on the Senate floor in 1997, Senator Hatch stated in relevant part: "This legislation will allow Federal agencies to retain control and ownership of facilities they have identified as needed for continued Government operation. Homes and properties not retained by the Federal Government will be sold at fair market value to current renters. Holders of federally issued permits and leases would have the right to purchase their

13

interpreting particular statutory language should also look to "the provisions of the whole law, and to its object and policy" for guidance,[8] the court here finds that Plaintiff's interpretation of Section 10(m) is not required to serve the Act's stated purposes. For instance, the Act states that its purpose is "to serve the interests of the residents of Dutch John *and Daggett County, Utah*, and the general public." Act §2(b)(8), 112 Stat. 3041 (emphasis added). Furthermore, in passing the Act Congress also found that "Daggett County, Utah, is interested in reducing the financial burden the County experiences in providing local government support services to a community that produces little direct tax revenue because of Federal ownership". *Id.* §2(a)(4)(B), 112 Stat. 3041. Thus, Plaintiff's legislative purpose argument is at best inconclusive in determining which of the two interpretations of Section 10(m) is most sound. And while the court deems examination of the Act's legislative history to be wholly unnecessary here,[9] it notes that Senator Hatch's floor statement is likewise ambiguous on this issue as it does not clearly state which specific sales revenues should "be used for costs related to Dutch John."

Therefore, the Act's plain language demonstrates that Section 10(m) does not require the County to pay its revenues derived from the sale of residual properties to the Treasury to be split between the federal government and Dutch John government and community services. That provision only applies to the federal government's property sales explicitly authorized under Section 10. Section 10(m) is not reasonably susceptible to any other interpretation.

---

underlying leased or permitted land at fair market value. All other properties will be transferred to Daggett County, and the *revenues from these sales would be used for costs related to Dutch John*." Cong. Rec., 105th Congress, 1st Session Issue: Vol. 143, No. 82, p. s5604 (Congressional Record) (emphasis added).

[8] *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1271 (10th Cir. 2000).

[9] *See generally Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in judgment) (the "greatest defect of legislative history is its illegitimacy. We are governed by laws, not by the intentions of legislators.")

## II. "Fair Market Value" Requirements

The parties agree that the Act requires the federal government to sell its designated property for fair market value and to deposit those revenues in the U.S. Treasury, with 15.1% for the Treasury's general fund and the remainder to be paid to the County semiannually to provide governmental and community services to the Dutch John community. (*See* Dkt. No. 29 at 3.) However, as with Section 10(m), nothing in the Act's language, broader statutory scheme, or purpose requires the County to sell its conveyed residual property for fair market value. Instead, as County Defendants convincingly observe, each of the Act's provisions that Plaintiff cites regarding the requirement to sell property for fair market value "explicitly or implicitly discuss sales by the federal government, not the county." (*Id.* at 6-7.) Plaintiff has failed to show that those sections even mention the County, much less obligate it to sell its property for fair market value in the same way as the federal government. Incorporating the reasoning above, the court likewise refuses to read this supposed fair market value requirement into the Act where Congress declined to supply it.

Regarding the required fair market value appraisals, the Act also explicitly specifies in detail how the Secretary of the Interior will pay for conducting these appraisals: funds are to be derived from the Upper Colorado River Basin Fund. Act §2(a)(6), 112 Stat. 3046. As County Defendants persuasively argue, however, when residual properties are conveyed to the County after two years, numerous prior appraisals would need to be updated to allow those properties to be sold for fair market value. The Act does not mention updating the appraisals, nor how the County is supposed to pay for them, even though it went into great detail on these points regarding the federal government's initial appraisals. Thus under Dutch John's interpretation, "the federal government saddles the county with funding those appraisals itself. The county

can't . . . even use revenues from selling the conveyed property to cover those costs because those must be paid to the Treasury and split between the Treasury's general fund and services for the town." (Dkt. No. 29 at 12.) Besides the fact that the Act's plain language provides no support for this appraisal requirement, Plaintiff's interpretation would directly undermine the Act's purposes of providing financial assistance to local government and reducing the County's financial burden in providing community support services to the Town.

The court therefore holds that the Act's requirements for properties to be sold for their appraised fair market value does not apply to the residual properties conveyed to the County. The Act is not reasonably susceptible to Plaintiff's interpretation on this point.

### III. Properties Conveyed "without Consideration"

Section 10 of the Act also provides that designated residences or lots, unoccupied platted lots, special use permit land, and church land that remains unpurchased after two years must be conveyed by the Secretary of the Interior "to Daggett County without consideration." *See* Act §§ 10(e)(4), 10(f)(1) & (7), 10(g)(1) & (6), 10(i)(1) & (3), 112 Stat. 3049-51. Yet Plaintiff's interpretation of Section 10(m) would require the County to pay 15.1% of the revenues it derives from its residual properties directly to the U.S. Treasury, with an additional limitation that the remaining 84.9% be used exclusively for the benefit of the Dutch John community.

Indeed, it is unclear from Plaintiff's interpretation what benefit (financial or otherwise) Daggett County would receive at all from such a conveyance. By contrast, the financial burdens of such an arrangement (including appraisals, marketing, closing, and maintenance of such properties) together with the expense of running the Town[10] would far exceed the benefit of the

---

[10] County Defendants note, for instance, that prior to the Act's enactment the federal government was spending nearly $1 million annually to run the Town. (*See* Dkt. No. 29 at 12-13.)

$300,000 annual payment the County receives under Section 13(b) to defray those costs. This would likewise be incompatible with the Act's purpose of reducing the County's financial burden of providing services to the Dutch John community.

It is a fundamental canon of statutory interpretation that courts should not "construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous." *Bridger Coal Co./Pac. Minerals, Inc. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 927 F.2d 1150, 1153 (10th Cir. 1991).[11] Furthermore, statutes must be interpreted "as a symmetrical and coherent regulatory scheme, . . . and fit, if possible, all parts into an harmonious whole." *Brown & Williamson*, 529 U.S. at 133. Plaintiff's proposed interpretation of the Act would render the phrase "without consideration" both ineffective and meaningless in each of these provisions, conflicting directly with the requirement that the land be conveyed by the federal government without consideration. The court instead opts to interpret Section 10(m) harmoniously with the Act's many requirements that residual property be conveyed to the County "without consideration." Requiring the County to pay 15.1% of its revenues from those sales to the U.S. Treasury, together with limiting what the County can do with the remaining 84.9% of revenues, would certainly constitute consideration for purposes of the Act, making it incompatible with the Act's plain requirements. Accordingly, application of these canons of interpretation likewise confirms that County Defendants' interpretation of the Act is more textually sound than Plaintiff's interpretation.

Finally, statutes should be interpreted to avoid absurd results. *See Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006). While the language of Section 10(m) does not reasonably allow for alternative constructions in the first place, the court notes that Plaintiff's proposed

---

[11] This canon is often referred to as the presumption against surplusage or ineffectiveness.

interpretation of the Act would yield the absurdly inefficient result of requiring the County to take revenue from its sales of residual property conveyed to it by the federal government and deposit all of that revenue into federal coffers, only to have the U.S. Treasury then return that money back to the County on a semiannual basis, which the County must in turn spend exclusively on Dutch John's services. (*See* Dkt. No. 29 at 8-9.) As County Defendants persuasively inquire: "Is the county entrusted to turn over to the Treasury all its sales revenues, yet not trusted to be able to deduct the 84.9% the Treasury will eventually give back [to the county]? Why is the county only semiannually considered a good steward over the money to be spent on the town?" (*Id.*) Plaintiff provides no satisfactory answer to these legitimate questions. Thus, Plaintiff's interpretation would also yield an absurd outcome that Congress plainly did not contemplate.

## CONCLUSION

For the foregoing reasons, County Defendants' Motion for Partial Judgment on the Pleadings is hereby GRANTED. Defendant Daggett County Redevelopment Agency's Motion to Dismiss for Failure to State a Claim (Dkt. No. 25) and County Defendants' counterclaim for an injunction (*See* Dkt. No. 24) are consequently moot. Plaintiff's Complaint is hereby DISMISSED with prejudice.

Signed February 14, 2019.

BY THE COURT

_/s/ Dee Benson_

District Judge Dee Benson